# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **GERONIMO RENE GUTIERREZ**, | § | |
| **TDCJ No. 999416,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-09-CA-543-FB** |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Geronimo Rene Gutierrez filed this action pursuant to 28 U.S.C. § 2254 challenging his April, 2002 Bexar County conviction in cause no, 2001-CR-1577 for capital murder and sentence of death.  For the reasons set forth below, petitioner is not entitled to federal habeas corpus relief or a Certificate of Appealability from this Court.

## I. Background and Procedural History

A.      Indictment

On March 27, 2011, a Bexar County grand jury indicted petitioner on a single count of capital murder, to wit, intentionally causing the death of Rick Marin on or about May 29, 1999, by shooting Mr. Marin with a deadly weapon, namely a firearm, and intentionally causing Rick Marin's death while in the course of committing and attempting to commit the offense of robbery upon him.[1]

---

[1] Transcript of pleadings. motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript") at p. 3.

B.      Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial began on April 1, 2002.  The Texas Court of Criminal Appeals summarized the relevant testimony presented during the guilt-innocence phase of petitioner's capital murder trial as follows:

> Manuel Torres, a life-long friend of appellant, testified that his neighbor, Ramon Martinez, had a Mercury Cougar in his backyard and that it did not have an engine. In the late spring of 1999, Martinez mentioned to Torres that he was interested in obtaining one.  Torres told Martinez that he knew someone who could help him find one and contacted appellant.  Appellant then met with Torres and Martinez at Martinez's house and told Martinez he could get an engine for him if he was willing to pay for it.  Approximately two weeks later, Torres witnessed appellant arriving at Martinez's house with a car engine and assorted car parts.  He helped appellant unload the engine and parts.  On direct examination, Torres stated that he asked where appellant got the engine and appellant replied that he had seen a Ford Mustang on the south side of the city, stolen it, stripped some of the parts, and removed the engine.  He then abandoned the car and burned it.  However, on cross-examination, Torres stated that appellant had not admitted to stealing the car or burning it.  On re-direct examination, after he was confronted with his statement to police and after the prosecutor warned him that one could get into trouble for lying under oath, Torres reluctantly conceded that appellant had, in fact, told Torres that he had stolen the car and burned it.

> Martinez testified that, at the suggestion of Torres, he met with appellant in April or May of 1999 to discuss the possibility of appellant obtaining an engine for Martinez's Mercury Cougar.  Appellant told Martinez that he could get a Ford Mustang 5.0–liter engine for $800.  Martinez agreed to the price.  A few days later, appellant went to Martinez's house after work, and the two discussed guns.  Appellant learned that Martinez owned a 12–gauge shotgun.  Appellant mentioned an upcoming gun show, and the two made plans to attend.  After attending the gun show, Martinez purchased a .22–caliber rifle and accompanied appellant to a ranch owned by appellant's mother to shoot the gun.  A few weeks later, appellant approached Martinez and asked to borrow his shotgun.  When Martinez refused, appellant asked to borrow $100 so that he could retrieve his shotgun from a pawn shop.  Martinez loaned appellant the money, but maintained he did not know what appellant planned to do with the shotgun.  About a month later, appellant appeared at Martinez's workplace.  He was driving a pick-up truck with a Ford Mustang 5.0–liter engine in the bed.  Appellant delivered the engine to Martinez's house, and Martinez paid appellant for it in cash. Martinez testified that, at a later date, appellant came to Martinez's home with a newspaper article that reported the discovery of Marin's charred Ford Mustang and

2

the search for Marin.  Appellant showed Martinez the article and said, "That's the guy I shot for the car."  Appellant then told Martinez that he had taken the car to "his lot" and had set it on fire.  In January of 2001, police went to Martinez's workplace, arrested him for receiving stolen property, and took him to the police station, where he gave a voluntary statement.  Family members informed him that, while he had been at the police station, a search warrant had been executed at his house.  During his questioning, Martinez told police where his guns were and gave his consent for police to retrieve them.  Tests on the weapons revealed that they had not been used in the murder in this case.  The charges against Martinez for receiving stolen property were later dropped.  Martinez acknowledged on the stand that he should have come forward and told police what he knew about Marin's death but was afraid to get involved.

Anthony Rodriguez testified that he had met appellant in 1998 while incarcerated in the Bexar County Jail and that the two had become friends.  In May of 1999, appellant went to Rodriguez's apartment and asked whether Rodriguez wanted to earn some money.  Rodriguez said that he did and accompanied appellant to Martinez's house. While there, Martinez asked appellant whether he could obtain a Ford Mustang 5.0–liter engine.  Appellant replied that he could and that the cost would be $1,000. A few weeks later, appellant told Rodriguez that he had seen a Ford Mustang with a 5.0–liter engine in the parking lot of Rodriguez's apartment complex and said that he wanted to steal it.  His plan was to pull the owner of the car into Rodriguez's apartment, shoot her, and steal the car.  Rodriguez testified that he was shocked by this idea and refused to go along with appellant's plan.  The next day, Rodriguez went with appellant to Martinez's house.  Appellant said that he was going there to borrow money from Martinez to get his shotgun out of a pawn shop. Appellant and Rodriguez then went to the Westside Pawn Shop, where appellant paid what he owed to retrieve his shotgun and filled out some paperwork.  The clerk told appellant it would be three working days before he could pick up the shotgun because of federal regulations.  The day before Marin's murder, appellant told Rodriguez he had a new idea about how to steal a Ford Mustang.  He said that he planned to flag down a Ford Mustang near Palo Alto College, shoot the driver, put the driver in the back seat, and drive away with the car.  Rodriguez testified appellant said, "I'm going to fucking shoot him, and I'm not giving the guy a chance."  Rodriguez said he wanted nothing to do with the plan and ignored appellant's phone calls the following day.  A few days later, appellant went to Rodriguez's apartment and asked Rodriguez if he wanted to "hang out."  Rodriguez said he did, and the two went to Martinez's house.  While there, appellant showed Rodriguez the 5.0–liter engine and said, "Remember what we were supposed to do Saturday?  I did it.  I got the motor."  After leaving Martinez's house, appellant and Rodriguez went to the home of appellant's girlfriend. The two watched the ten-o'clock news with appellant's girlfriend.  One of the stories on the news was about Marin's disappearance.  Rodriguez testified that,

after seeing the news story, appellant became "shaky" and told Rodriguez, "That shit we were watching right now, I—I did it."

*Gutierrez v. State*, No. 74,341, 2004 WL 3092763, at *1-2 (Tex. Crim. App. Apr. 21, 2004) (Footnote omitted).

On April 12, 2002, the jury returned its verdict, unanimously finding petitioner guilty of capital murder as charged in the indictment.[2]

C.     Punishment Phase of Trial

The punishment phase of petitioner's trial began on April 15, 2002.  The prosecution called: (1) one of petitioner's probation officers who testified petitioner has twice been placed on probation, had been sent to a zero tolerance boot camp after failing a urinalysis, and was on probation at the time of his capital offense,[3] (2) a Bexar County Sheriff's Deputy who testified petitioner executed an acknowledgment of gang affiliation during a stay at the Bexar County Jail on which petitioner listed his street name as "redrum,"[4] (3) a San Antonio Police gang unit officer who testified petitioner's self-declared gang affiliation was with the Big Time Kings, a criminal street gang also known as the West Side Barrio Kings which was involved in much violent crime, and petitioner had indicated on his gang affiliation form that he had a leadership role in the gang,[5] and (4) four members

---

[2] Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 30, at pp. 86-88; Trial Transcript, at p. 153.

[3] S.F. Trial, Volume 31, testimony of Rosemary Saldana, at pp. 11-27.

[4] S.F. Trial, Volume 31, testimony of Jimmy Pearson, at pp. 28-60.

[5] S.F. Trial, Volume 31, testimony of Rocky Dyer, at pp. 62-83.

4

of Rick Marin's family who all testified regarding the emotional tumult they experienced following his murder by petitioner.[6]

The defense presented testimony from: (1) a Bexar County criminal courts supervisor that petitioner had been arrested in March, 2001 and had never made bond,[7] (2) petitioner's sister that (a) petitioner lost an important person in his life when their father died nine years before, (b) petitioner was kind of slow but tried when he was in school, (c) petitioner had been with Ruth Molina for four years and they have three children, (d) petitioner was never mean or a troublemaker when he was growing up, (e) other people are not afraid of petitioner, (f) she does not believe her brother killed anyone, and (g) she and two other siblings grew up in the same home as petitioner but have not committed any crimes,[8] (3) petitioner's widowed mother that petitioner was (a) a good son, (b) not violent, (c) not retarded but not a fast learner, (d) never a problem at school, (e) had a difficult time after his father died from a heart attack, (f) was not a killer and not a threat to anyone, and (g) has changed for the better since his arrest,[9] and (4) a Bexar County Deputy Sheriff assigned to the

---

[6] More specifically, Rick Marin's younger brother Steven testified regarding the great emotional distress he and other family members suffered during the days between Rick Marin's disappearance and the discovery of his charred corpse and the even more devastating emotional blow felt by himself and other members of his family when Rick Marin's body was located and identified. S.F. Trial, Volume 31, testimony of Raul Steven Marin, at pp. 86-105. Rick Marin's sister Michelle testified regarding the emotional blow felt by her, her mother, and her oldest son, to whom Rick Marin had been like a father. S.F. Trial, Volume 31, testimony of Michelle Marin, at pp. 106-26. Rick Marin's father testified regarding the emotional impact of Rick's murder upon him. *Id.,* Volume 31, testimony of Raul Marin, at pp. 132-49. Rick Marin's mother testified she had been so devastated by her son's murder she had been forced to quit her job working with handicapped young children because she could not face the children without crying all the time. *Id.*, Volume 31, testimony of Vicci Marin Almanza, at pp. 150-69.

[7] S.F. Trial, Volume 32, testimony of Michael Gonzales, at pp. 5-7.

[8] S.F. Trial, Volume 32, testimony of Claudia Gutierrez, at pp. 8-37.

[9] *Id.*, Volume 32, testimony of Susana Gutierrez, at pp. 38-54.

Bexar County Adult Detention Center that, during an incident on July 19, 2001, when another inmate attacked the deputy, petitioner came to the deputy's assistance.[10]

On April 18, 2002, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding unanimously beyond a reasonable doubt there is a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and unanimously taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances or circumstance to warrant a sentence of life imprisonment be imposed.[11]   The trial court instructed that the petitioner be transmitted to the custody of the Texas Department of Criminal Justice pending imposition of a sentence.[12]

D.   Direct Appeal

Petitioner appealed.[13]   In an unpublished opinion issued April 21, 2004, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Gutierrez v. State*, no. 74,341, 2004 WL 3092763 (Tex. Crim. App. Apr. 21, 2004).   Petitioner did not thereafter seek review from the United States Supreme Court via certiorari.

---

[10] *Id.*, Volume 32, testimony of Michael DeWitt, at pp. 55-64 & 76-102.

[11] S.F. Trial, Volume 34, at pp. 5-6; Trial Transcript, at pp. 189-92.

[12] S.F. Trial, Volume 34, at pp. 9-10; Trial Transcript, at pp. 211-12.

[13] Petitioner's appellant's brief, filed June 26, 2003, by attorney Michael C. Gross, raised nine points of error consisting of claims that:  (1) the prosecution's closing jury argument at the guilt-innocence phase of trial constituted an improper comment on petitioner's failure to testify, (2) the trial court erred in failing to instruct the jury regarding the accomplice witness testimony of Ramon Martinez and Anthony Rodriguez, (3) the trial court erred in allowing the prosecution to improperly impeach witness Manuel Torres, (4) the trial court erred in admitting gruesome photographs, (5) the trial court erred in admitting evidence of petitioner's gang membership at the punishment phase of trial, (6) the trial court erred in admitting victim impact testimony at the punishment phase of trial, and (7) the evidence was legally and factually insufficient to support the jury's guilty verdict.

6

E.   First State Habeas Corpus Proceeding

On March 1, 2002, petitioner filed his first state habeas corpus application, asserting that:
(1) petitioner's trial counsel rendered ineffective assistance by (a) failing to have a mitigation expert appointed to assist the defense team, (b) failing to have a psychologist appointed to assist the defense team, (c) failing to adequately investigate petitioner's background and present available mitigating evidence, and (d) failing to present evidence showing petitioner is mentally retarded, and (2) petitioner is exempt from execution by virtue of the Supreme Court's holding in *Atkins v. Virginia* forbidding the execution of mentally retarded individuals.[14]   The state trial court held an evidentiary hearing on petitioner's initial state habeas corpus application on September 20, 2005, and heard testimony from one of petitioner's former trial counsel[15] and an expert witness presented by

_____

[14] Petitioner's first state habeas corpus application was signed by attorney Terry McDonald on February 26, 2004, and filed on March 1, 2004.

[15] During the evidentiary hearing held September 20, 2005, the state trial court heard testimony from petitioner's former co-counsel at trial attorney David Bays that:  (1) he reviewed the prosecution's case file, evidence of petitioner's background, petitioner's educational records, interviewed petitioner's mother and sister, and made the determination not to request appointment of a mitigation expert because he preferred to conduct the mitigation investigation himself, (2) the only evidence petitioner had any mental problems consisted of evidence showing petitioner had been placed in special education classes beginning in middle school, (3) he interviewed petitioner and believed that while petitioner had a reading deficiency, petitioner was not mentally retarded, (4) he did not believe any potential helpful mitigating evidence could be developed through further investigation into petitioner's mental health, (5) he was aware petitioner had been placed in alternative schools but believed that reflected petitioner's bad behavior and alcohol abuse rather than a mental deficiency, (6) petitioner admitted to recreational use of heroin and cocaine, reported he joined a gang and sold drugs and stole merchandise in his late teens and early twenties, (7) he had no problems communicating with petitioner and saw no reason to have petitioner tested for mental retardation, (8) petitioner's school records showed that petitioner had been abusive toward teachers and other students, (9) he never saw any information in petitioner's records which suggested the availability of a psychological defense or any possible advantage to investigating mental health evidence as mitigation, (10) he believed defense counsel could do an adequate investigation for mitigating evidence without the assistance of a mitigation expert, (11) petitioner appeared shocked when attorney Bays explained that petitioner's shotgun could be linked to the shotgun shells found at the scene where the charred body of the victim was recovered,  (12) none of the witnesses with whom the defense team spoke ever indicated they believed petitioner was mentally retarded, (13) petitioner's mother told defense counsel and testified at trial that petitioner was slow but not retarded, (14) petitioner denied being responsible for Rick Marin's death but could offer no helpful information to his defense team (15) petitioner's defense team had the assistance of an experienced investigator and experienced trial counsel, (16) David Bays did not consider evidence of petitioner's voluntary drug abuse to be mitigating because he believed it would be viewed negatively by the jury, (17) petitioner's co-counsel attorney Mike Sawyer presented the defense's witnesses at the punishment phase of trial, (18) a lot of petitioner's activities recorded in petitioner's records

petitioner's first state habeas counsel.[16]  The state trial court held another evidentiary hearing on petitioner's first state habeas corpus application on January 6, 2006, during which it heard testimony from a pair of mental health experts regarding their opinions on whether petitioner is mentally retarded.[17]

---

were anti-social in nature, (19) attorney Bays believed petitioner's poor performance on academic skills was more a function of petitioner's disinterest with the subject than an inability to perform the academic skills, (20) he found nothing which suggested that petitioner suffered from any significant limitations in adaptive behavior such as academic skills, work, self-direction, use of community resources, leisure activity or health and safety skills, and (21) the defense developed and presented mitigating evidence showing the petitioner was not violent growing up, had a loving wife and children, had a job, could perform academically when motivated to do so, and had helped a guard during a fight at the BCADC.  Statement of Facts from evidentiary hearing held September 20, 2005, in petitioner's first state habeas corpus proceeding, found at "First State Habeas Transcript," Volume 1 of 2 of the Court Reporter's Record, testimony of David Bays, at pp. 11-99.  Attorney Bays' testimony appears in a stand-alone volume from the rest of the First State Habeas Transcript submitted by respondent to this Court.

[16] During the same September 20, 2005, hearing, the state trial court also heard testimony from attorney John Niland that: (1) he believed employment of a mitigation specialist was an absolute necessity in every capital murder case, (2) the ABA Guidelines in place in May, 2000 mandated employment of a mitigation specialist in every capital murder case, (3) it is very rare when mental health is not an issue in a capital murder case, (4) the Supreme Court's holding in *Wiggins* suggests a need for a social history to be prepared in every capital murder case, (5) preparation of a social history includes collection of birth records and school records, (6) even without mental retardation, low intelligence can have mitigating value, (7) he did not speak with petitioner or either of petitioner's trial counsel, (8) he had not reviewed any of the testimony from the punishment phase of petitioner's trial, (9) he relied exclusively upon the factual information contained in attorney McDonald's first state habeas corpus application in formulating his opinions,  (10) even without a showing of mental retardation, a showing of low intelligence could have mitigating value, and (11) he believed petitioner's trial counsel should have conducted a more thorough investigation into petitioner's mental health and intelligence level because low intelligence is inherently mitigating.  First State Habeas Transcript, Volume 1 of 2 of the Court Reporter's Record, testimony of John Niland, at pp. 100-159.

[17] Dr. Susana Rosin, a clinical psychologist, testified:  (1) she testified petitioner for three and a half hours and found petitioner had a verbal IQ of 68, a performance IQ of 77, and a full scale IQ of 70, (2) petitioner had adaptive functioning deficits prior to age 18 in the areas of communication, living skills, and socialization, (3) petitioner is mildly mentally retarded, (4) petitioner has a history of academic problems and dropped out of school, (5) petitioner has never been able to live independently, (6) petitioner was tested at age thirteen or fourteen in February, 1991 and scored 91 on an IQ test, (7) nonetheless petitioner was labeled as learning disabled and placed in a vocational program, (8) petitioner displays many of the traits of a person with an anti-social personality, (9) persons with anti-social personality do not learn from experience and display poor judgment and impulsiveness, (10) she has discussed with an attorney the need to avoid presenting evidence of an anti-social personality at the punishment phase of a capital murder trial, (11) she has not reviewed any of petitioner's disciplinary records from the TDCJ, (12) she has spoken with petitioner's mother and sister, (13) it is impossible to factor out the possibility petitioner's current IQ score reflects the results of petitioner's abuse of alcohol and narcotics, (14) petitioner has a history of alcohol and narcotics abuse, (15) no testing has been done to determine if petitioner has organic brain damage, (16) abuse of solvents such as paint thinners can cause organic brain damage, (17) she did not speak with any of petitioner's employers, friends, or teachers, (18) during her testing she found petitioner was capable of responding rationally to stimuli, concealing information, and engaging in forethought, and (19) petitioner currently resides on death row, where opportunities for independent behavior are limited.  First State Habeas Transcript, Volume 2 of 2 Court Reporter's Record, testimony of Dr. Susana Rosin, at pp. 6-90 (pages 161-245 of the

On June 16, 2008, the state habeas trial court issued its findings of fact and conclusions of law, determining that (1) petitioner's trial counsel did not request the assistance of a mitigation specialist but did obtain the services of an investigator, (2) petitioner's trial counsel investigated petitioner's background, interviewed petitioner's mother, common law wife, employer, and various other acquaintances, (3) petitioner was unable to furnish his trial counsel with the names of any good character witnesses, (4) attorney David Bays was unaware of any information showing petitioner was mentally retarded, (5) petitioner and his mother both represented to Mr. Bays that petitioner was not retarded, (6) attorney Bays did not discover any information showing petitioner had any significant limitations in adaptive behavior, (7) attorney Bays believed petitioner's poor academic performance was a function of disinterest rather than inability, (8) petitioner tested at an IQ of 91 just before his fourteenth birthday, (9) petitioner admitted to a long history of alcohol and drug abuse, including marijuana, cocaine, heroin, and smoking cigarettes dipped in paint thinner and embalming fluid, (10) Dr. Rosin believes petitioner displays many of the traits of a person with anti-social personality disorder, (11) persons with anti-social personality disorder are likely to pose more of a danger to others than persons who do not possess such personalities, (12) IQ testing performed by Dr. Kern and relied upon by Dr. Sparks found petitioner had a verbal score of 65, a performance score of 85, and a full scale of 72, (13) petitioner is not mildly mentally retarded, (14) petitioner's adaptive

---

First State Habeas Transcript).

    Dr. John C. Sparks, a psychiatrist with decades of experience treating incarcerated individuals, testified:   (1) he reviewed IQ testing done by Dr. Paul Kern, petitioner's medical records, arrest record, probation records, and TDCJ mental health records, (2) Dr. Kerns found petitioner had a verbal score of 65, a performance score of 85, and a full scale score of 72, (3) after his clinical interview with petitioner, he believed petitioner was mildly depressed but functioning above the range of mentally retarded persons, (4) he believed petitioner would function at a higher level if motivated to do so, (5) he believed petitioner's adaptive behavior abilities are above those of persons who are mentally retarded, and (6) he does not believe petitioner is mentally retarded within the definition of that term as used in the Texas Health and Safety Code.  First State Habeas Transcript, Volume 2 of 2 Court Reporter's Record, testimony of Dr. John C. Sparks, at pp. 94-149 (pages 249-304 of the First State Habeas Transcript).

behavior is above the level of ability for a person with mental retardation, (15) petitioner failed to present any evidence showing what additional mitigating information a mitigation specialist would have furnished to defense counsel, (16) petitioner's attorneys did a thorough job investigating petitioner's background, (17) petitioner is not mentally retarded, (18) testimony at trial regarding petitioner's recent low IQ scores would likely have opened the door to testimony regarding petitioner's anti-social personality disorder and history of drug abuse, and (19) petitioner's offense required forethought, planning, and complex execution of purpose above the level of ability possessed by a person with mental retardation.[18]

On October 1, 2008, the Texas Court of Criminal Appeals denied petitioner's first state habeas corpus application in a written order in which that court expressly adopted the findings and conclusions of the trial court. *Ex parte Geronimo Gutierrez*, WR-70,152-01, 2008 WL 4417161 (Tex. Crim. App. Oct. 1, 2008).

F.     Initial Proceedings in this Court

Petitioner filed his original petition for federal habeas corpus relief in this Court on September 30, 2009 (ECF no. 8).  Petitioner field his first amended petition on February 12, 2010 (ECF no. 28).  In an Order issued August 31, 2010, this Court granted petitioner's motion to stay this cause to permit petitioner to return to state court and exhaust available state court remedies on new claims and new evidence which petitioner's federal habeas counsel represented had not yet been presented to the state courts (ECF no. 45).

---

[18] First State Habeas Transcript, at pp. 141-55.

G.    <u>Second State Habeas Corpus Proceeding</u>

On or about February 4, 2011, petitioner filed his second state habeas corpus application in which he asserted (1) once again that he is mentally retarded and therefore exempt from execution under the Supreme Court's holding in *Atkins v. Virginia*, (2) the prosecution violated the Supreme Court's holding in *Brady v. Maryland* by withholding from the defense mitigating information showing that petitioner delivered more auto parts to Ramon Martinez than petitioner had previously agreed to furnish (specifically a transmission and additional headers) for the same price the men had agreed upon for the motor alone, (3) petitioner's trial counsel rendered ineffective assistance at the punishment phase of trial by (a) failing to conduct an adequate investigation into petitioner's mental health, (b) failing to retain the services of a mitigation specialist, (c) waiving opening statement at the punishment phase of trial, and (d) failing to obtain a mental health evaluation of petitioner, and (4) petitioner's initial state habeas counsel was ineffective by (a) failing to adequately investigate petitioner's background and present all available mitigating evidence, (b) filing a boiler-plate state habeas corpus application, (c) failing to call witnesses to testify anecdotally about petitioner's adaptive behavior deficits, (d) failing to visit with petitioner prior to filing petitioner's first state habeas corpus application, (e) failing to call petitioner's mother to testify at the state habeas writ hearing, (f) failing to call Manuel Torres to testify during the state habeas writ hearing regarding petitioner's lack of sophistication and limited skills as a mechanic, (g) failing to call petitioner's former teachers Louise Kerr and Kyle McQuilkin to testify during petitioner's first state writ hearing,

and (h) failing to call petitioner's co-worker Richard Woodward to testify regarding petitioner's limited intellectual abilities and adaptive behavior skills.[19]

In an unpublished order issued October 23, 2013, the Texas Court of Criminal Appeals held petitioner's subsequent application failed to satisfy the requirements of Article 11,071, § 5(a) and summarily dismissed the application as an abuse of the writ without considering the merits of the claims. *Ex parte Geronimo Gutierrez*, WR-70,152-02, 2013 WL 5773415 (Tex. Crim. App. Oct. 23. 2013).[20]

---

[19] Second State Habeas Transcript (WR-70,152-02), at pp. 1-136.  Petitioner accompanied his second state habeas corpus application with a voluminous set of documents he had not presented to the state court during his first state habeas corpus proceeding.  Included among these documents were: (1) an affidavit from petitioner's mother asserting petitioner was mentally retarded, disadvantaged, and a follower and asserting petitioner's father abused alcohol and abused petitioner, (2) an affidavit from petitioner's former art teacher Kyle Stephen McQuilkin asserting petitioner was a follower and a poor artist, (3) an affidavit from petitioner's former teacher Roberta Louise Stevens Kerr asserting petitioner is mildly retarded and could not understand the consequences of his actions, (4) an affidavit from petitioner's former co-worker Richard Woodward-Hetchler asserting petitioner was naive, not smart, and could not read, (5) an affidavit from petitioner's lifelong friend and prosecution witness Manuel Cerna Torres asserting petitioner was not smart, does not understand the consequences of his bad acts, and could not read - which led to petitioner dropping out of school, (6) a business records affidavit from Betty Detmer with the Somerset ISD regarding petitioner's Special Education records, (7) Special Educations records from the Somerset ISD stating (a) petitioner tested at a full scale IQ of 91 on or about February 25, 1991, and (b) petitioner tested at a full scale IQ of 84 on or about January 31, 1994, at which time petitioner was labeled "emotionally disturbed" and it was noted petitioner had attempted to hit his mother, does not accept responsibility for his actions, is impulsive and oppositional, and uses alcohol to excess, and (8) Special Education records from the Somerset ISD attributing petitioner's seven-point drop in IQ to petitioner's alcohol abuse, reporting petitioner nonetheless knows right from wrong, and diagnosing petitioner with conduct disorder, i.e., the pre-adult precursor to an adult diagnosis of anti-social personality disorder.  Second States Habeas Transcript, at pp. 138-45, 147-52, 154-58, 160-65, 167-77, 215-49, 283-93, 295-99, 301-08, 311-13, 315-17, 319-21, 323-32, 334-39, 341-52, 354-56, 358-71, 377-81, 387-408.  The discussions of petitioner's IQ test scores most relevant to his *Atkins* claim appear at pp. 298, 361, 377-81, and 401-06.  Significantly, these *new* school records furnished:  (1) an additional IQ test score of 84 well above the standard of error for a finding of mental retardation, (2) notations attributing petitioner's declining IQ test scores to his abuse of alcohol, and (3) a diagnosis of petitioner with "conduct disorder," the precursor to an adult diagnosis of anti-social personality disorder.

[20] Two members of the Texas Court of Criminal Appeals wrote a concurring opinion in which they (1) analyzed petitioner's new school records, (2) concluded those records confirmed the state habeas court's initial rejection on the merits of petitioner's *Atkins* claim, (3) pointed out that the new records furnished by petitioner showed a record of violent misconduct by petitioner, who was described as "impulsive, depressed, pessimistic, and oppositional," (4) pointed out a mental health evaluation which labeled petitioner's emotional disturbance as "severe," and (5) concluded petitioner's high school records "are not beneficial to applicant because they show that he was in special education primarily because of his disruptive personality rather than due to mental retardation."  *Ex parte Geronimo Gutierrez*, 2015 WL 5773415, at *7.  This is basically the same conclusion petitioner's co-counsel at trial, attorney David Bays, reached prior to trial, as he explained during his testimony at petitioner's first state habeas corpus proceeding.  First State Habeas Transcript, Volume 1 of 2 Court Reporter's Record, testimony of David Bays, at pp. 16-20, 25, 35, 37-38, 61-64, 75, 79-82, 88.

H.     Return to this Court

After this Court lifted its stay on April 25, 2014, petitioner filed his second amended petition, in which he argued: (1) he is exempt from execution because he is mentally retarded and (2) his trial counsel rendered ineffective assistance in connection with the punishment phase of petitioner's trial by (a) failing to request the assistance of a mitigation specialist, (b) failing to obtain all of petitioner's school records, (c) waiving an opening statement at the punishment phase of trial, (d) meeting with petitioner for only 9.6 hours prior to trial, (e) failing to more thoroughly investigate petitioner's background and mental health, (f) failing to retain the services of a mental health professional to evaluate petitioner's IQ, and (g) conducting an inadequate investigation into petitioner's background, and (3) petitioner's state habeas counsel rendered ineffective assistance during petitioner's initial state habeas corpus proceeding by failing to adequately investigate, develop, and present evidence showing petitioner is mentally retarded (ECF no. 70).

On October 6, 2014, respondent filed an answer to petitioner's second amended petition and argued therein that:   (1) petitioner failed to prove he is intellectually disabled, (2) petitioner procedurally defaulted on a portion of his ineffective assistance claims, only a portion of which were included in petitioner's initial state habeas corpus application, (3) petitioner's trial counsel were not ineffective for failure to investigate and present a defense based upon mental retardation (or intellectual disability) because such a defense would have opened the door to evidence showing petitioner's anti-social personality, (4) petitioner is not permitted to present new evidence in support of his exhausted ineffective assistance and mental retardation claims under the holding in *Cullen v.*

---

Attorney Bays also pointed out during his testimony in petitioner's first state habeas corpus proceeding that petitioner was tried prior to the Supreme Court's decision in *Atkins v. Virginia* and that evidence of mental retardation was clearly double-edged in nature.  *Id.* at pp. 79-80, 96-97.

*Pinholster*, and (5) errors in petitioner's initial state habeas corpus proceeding, including ineffective assistance by petitioner's initial state habeas corpus counsel, do not furnish an independent basis for federal habeas corpus relief (ECF no. 77).

On December 1, 2014, petitioner filed a reply to respondent's answer in which petitioner expressly abandoned his *Atkins* claim. Petitioner argued his procedural default on portions of his ineffective assistance claim resulted from the ineffective assistance of his initial state habeas corpus counsel in failing to present all of the mitigating evidence available at the time of petitioner's trial which had been attached to petitioner's second state habeas corpus application (ECF no. 82).

## II. <u>AEDPA Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if the state court

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the

state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

> As the Supreme Court has explained:
>
> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts.  *See Lopez v. Smith*, ___ U.S. ___, ___, 135 S. Ct. 1, 2, 190 L. Ed. 2d 1 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination.  *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous.  *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual

17

findings under Section 2254(d) (2). *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, 132 S. Ct. 124 (2011); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Atkins* Claim

In his first claim for relief in his second amended petition, petitioner argued he is mentally retarded and therefore, exempt from execution under the Supreme court's holding in *Atkins v. Virginia*,  536 U.S. 304 (2002), which held the Eighth Amendment precludes the execution of mentally retarded capital murderers.[21]  As explained above, the Texas Court of Criminal Appeals denied this same claim on the merits in the course of petitioner's first state habeas corpus proceeding.  Petitioner re-urged the same claim in his second state habeas corpus application which the Texas Court of Criminal Appeals summarily dismissed as an abuse of the writ.  In his most recent pleading, petitioner expressly withdrew his *Atkins* claim from this Court's consideration.[22]

Moreover, whether a petitioner is intellectually disabled is a question of fact.  *Henderson v. Stephens*, 791 F.3d 567, 579 (5th Cir. 2015), *petition for cert. filed,* Feb. 3, 2016 (no. 15-7974). Petitioner has failed to allege any facts and has not furnished any clear and convincing evidence showing the state habeas court's factual findings rejecting petitioner's *Atkins* claim on the merits in the course of petitioner's initial state habeas corpus proceeding were in any respect erroneous.  On the contrary, the new school records and other information furnished by petitioner in the course of his second state habeas corpus proceeding fully support the state habeas court's conclusion in

---

[21] Second Amended Petition, filed April 25, 2014 (ECF no. 70), at pp. 7-58.

[22] Petitioner's Reply to Respondent's Answer, filed December 1, 2014 (ECF no. 82), at pp. 1-2.

petitioner's initial state habeas corpus proceeding that petitioner is not intellectually disabled.[23] Petitioner's withdrawn *Atkins* claim does not warrant federal habeas corpus relief.

## IV. <u>Ineffective Assistance by Initial State Habeas Counsel</u>

In his third claim for relief in his second amended petition, petitioner argues his initial state habeas counsel rendered ineffective assistance by failing to adequately investigate, develop, and present evidence showing petitioner is mentally retarded.[24]   Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas corpus relief.  *Henderson v. Stephens*, 791 F.3d at 578; *Ladd v. Stephens*, 748 F.3d 637, 644 (5th Cir.), *cert. denied*, 135 S. Ct. 192 (2014); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2876 (2014); *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012).   This is because an attack upon the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.  *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004); *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir.), *cert. denied*, 534 U.S. 1001 (2001).   The same rule applies to allegations of ineffective assistance by state habeas counsel.  *See Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) ("Ineffectiveness of post-conviction counsel cannot be the grounds for federal habeas relief."), *cert. denied*, 563 U.S. 919

---

[23] Those records include evidence petitioner tested with an IQ of 91 in middle school and 84 in high school (both scores are well above the statistical margin of error for a finding of even mild mental retardation) and that the decline in petitioner's IQ was attributed to petitioner's alcohol abuse.  Both Dr. Rosin and Dr. Sparks agreed during their testimony in petitioner's initial state habeas corpus proceeding that alcohol abuse, narcotics abuse, and abuse of inhalants (all of which petitioner admitted) could not be ruled out as a major cause of petitioner's less than stellar performance on a pair of IQ tests following his conviction for capital murder and sentence of death.  During his second state habeas corpus proceeding, petitioner failed to present the state court with any evidence showing his poor scores on his IQ tests following his conviction for capital murder were the product of an intellectual disability which manifest prior to age eighteen rather than being reflections of petitioner's long history of substance abuse, anti-social personality, and lack of motivation to perform well on those tests following the Supreme Court's ruling in *Atkins*.  Petitioner has failed to establish there was anything objectively unreasonable with the state habeas court's rejection on the merits of petitioner's *Atkins* claim during the course of petitioner's initial state habeas corpus proceeding.  Thus, under the AEDPA's deferential standard of review, petitioner is not entitled to any relief from this Court based upon his *Atkins* claim.

[24] Second Amended Petition, filed April 25, 2014 (ECF no. 70), at pp. 107-13.

20

(2011); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (holding complaints about the performance of state-appointed counsel in petitioner's first post-conviction proceeding were inadequate to warrant federal habeas relief); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir.) (complaints of denial of effective assistance of counsel during state post-conviction proceeding did not furnish a basis for federal habeas relief), *cert. denied*, 543 U.S. 849 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 606 (5th Cir. 2003) (complaints of ineffective assistance by state habeas counsel did not furnish a basis for federal habeas relief), *cert. denied*, 540 U.S. 1163 (2004); 28 U.S.C. Section 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Petitioner's conclusory assertions of ineffective assistance by his initial state habeas counsel do not furnish an independent basis for federal habeas corpus relief.

## V. Ineffective Assistance by Trial Counsel

A.    The Complaints

In his second claim for relief in his second amended petition, petitioner argues that his trial counsel rendered ineffective assistance in connection with the punishment phase of petitioner's capital murder trial by failing to conduct a thorough investigation into mitigating evidence.[25] More specifically, petitioner complains his trial counsel: (1) failed to request the assistance of a mitigation specialist,[26] (2) failed to request the assistance of a mental health expert and a mental health

---

[25] Second Amended Petition (ECF no. 70), at pp. 59-107.

[26] *Id.* at pp. 92-97.

evaluation of the petitioner,[27] (3) failed to secure all of petitioner's relevant school records,[28] (4) waived an opening statement at the punishment phase of trial,[29] (5) met with petitioner for less than ten hours prior to trial,[30] and (6) undertook an inadequate investigation of petitioner's background for mitigating evidence.[31]

B.    The Constitutional Standard

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and gives rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must

---

[27] *Id.* at pp. 104-07.

[28] *Id.* at pp. 95-96.

[29] *Id.* at p. 97.

[30] *Id.* at p. 98.

[31] *Id.* at pp. 101-07.

show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).  In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight.  *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89.  It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*,

466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.  *Strickland v. Washington*, 466 U.S. at 694.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis.  *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*  In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo*.  *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence.  *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir.), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009).  Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all

24

significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

C.      State Court Disposition

During his first state habeas corpus proceeding, petitioner argued his trial counsel rendered ineffective assistance by failing to have a mitigation expert and a mental health expert appointed to assist the defense, failing to investigate petitioner's background for mitigating evidence, and failing to present evidence showing petitioner is mentally retarded.[32]  After holding a pair of evidentiary hearings during which it heard testimony from one of petitioner's co-counsel at trial, an expert witness on mitigation investigations in capital cases, and a pair of mental health experts, the state habeas trial court concluded:  (1) petitioner's trial counsel conducted a thorough investigation of petitioner's background, (2) petitioner failed to present any new mitigating evidence of which petitioner's trial counsel were unaware at the time of trial, (3) the only evidence available at the time of trial regarding petitioner's intellectual abilities would have shown petitioner was not mentally retarded, (4) petitioner failed to demonstrate he suffered from significantly subaverage general intellectual functioning prior to age eighteen, (5) petitioner's later IQ tests were affected by petitioner's drug abuse, (6) petitioner's offense required planning and complex execution, and (7) evidence of petitioner's low intellectual functioning at the time of trial would have had only marginal utility to the defense and would likely have opened the door to evidence and expert testimony showing petitioner's anti-social personality and long history of disruptive behavior which rendered him dangerous.[33]  The Texas Court of Criminal Appeals adopted the state trial court's findings and

---

[32] First State Habeas Transcript, at pp. 2-21.

[33] First State Habeas Transcript, at pp. 141-55.

conclusions and rejected petitioner's ineffective assistance claims on the merits. *Ex parte Geronimo Gutierrez*, WR-70,152-01, 2008 WL 4417161, *1 (Tex. Crim. App. Oct. 1, 2008).

D.     Analysis

Because petitioner has presented both exhausted and procedurally defaulted claims of ineffective assistance, this Court will undertake *de novo* review of all of petitioner's ineffective assistance claims. *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the aggravating evidence against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27. The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F. 3d 482, 491 (5th Cir. 2012) (*citing Harrington v. Richter*, 562 U.S. 86 (2011)), *cert. denied*, 133 S. Ct. 1244 (2013).

26

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir.), *cert. denied,* 562 U.S. 911 (2010). "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Id.*

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* analysis only by naming the witness, demonstrating the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

The bulk of the new evidence petitioner presents here in support of the ineffective assistance claims contained in his second amended petition is repetitive of the information about petitioner's background presented through Dr. Rosin during the evidentiary hearings held during petitioner's initial state habeas corpus proceeding. During petitioner's initial state habeas corpus proceeding his trial co-counsel, attorney David Bays, testified at great length regarding his investigation into petitioner's background. Specifically, attorney Bays testified that: (1) he was appointed February 1, 2001, and jury selection began February 28, 2002, (2) the trial court appointed Gilbert Carasco as defense investigator, (3) he visited with petitioner eight times at the BCADC, (4) he did not request appointment of a mitigation specialist because he conducted the mitigation investigation himself because he believed at the time of petitioner's trial that an experienced trial counsel and

27

investigator could conduct a thorough background investigation and mitigation specialists tended to have an aura of hucksterism about them and were actually glorified investigators, (5) he looked into petitioner's whole background, (6) he looked for discovery in the prosecution's case file where he reviewed petitioner's school records, (7) he interviewed petitioner's mother, common law wife Ruth Molina, and other friends of petitioner, (8) the only indication he found that petitioner had any mental problems was that petitioner had been placed in special education in school, (9) this did not raise red flags for him because of the other information in petitioner's school records which showed petitioner's placement in special education was based upon petitioner's disruptive behavior not upon an inability to perform academically, (10)  he discovered all of the information about petitioner's background contained in Dr. Rosin's report, including information showing petitioner had a history of marijuana and alcohol abuse, admitted to recreational use of cocaine and heroin, joined a gang, and sold drugs and stole merchandise in his late teens and early twenties, (11) the more he dug into petitioner's background, the more he became convinced the defense would have a difficult time presenting much in the way of mitigating evidence, (12) he never observed any conduct by petitioner which caused him to suspect petitioner was mentally retarded or had any mental problems at all, (13) he never had any problem communicating with petitioner and never found any other evidence suggesting petitioner was mentally retarded, (14) he never saw a need to have petitioner tested for intellectual disability (formerly mental retardation) or to have petitioner's mental health evaluated, (15) petitioner's school records showed he was abusive toward other students, teachers, and even parents, (16) he concluded petitioner was a rebellious young man who got into trouble with a lot of people and ended up quitting school after being sent to an alternative campus, (17) he never found any information which suggested the defense team might be able to raise a psychological defense

28

or present mitigating evidence of mental health problems, (18) the defense team interviewed not only petitioner's mother and wife (whom attorney Bays believed to have been an accomplice to petitioner's capital offense) but also petitioner's employer and a variety of persons including Paul Lozano, Irene Escobedo Dominguez, Ramon Martinez, and Manuel Torres, (19) no one with whom the defense spoke ever suggested petitioner was mentally retarded, (20) the defense presented mitigating evidence through petitioner's mother and sister showing petitioner was not violent as a child, (21) the defense presented mitigating evidence through a jail guard showing petitioner had assisted the guard when the guard was attacked by another inmate, (22) he did not view evidence of voluntary intoxication as a mitigating factor because he believed the jury would likely view such evidence negatively, (23) he did not believe evidence showing the petitioner had been abused and behaved violently as a child would be helpful because the jury would likely believe such evidence showed a leopard could not change its spots, and (24) co-counsel attorney Michael Sawyer spoke with petitioner's mother and sister Claudia and called both to testify at the punishment phase of trial that petitioner had a loving wife and children and was gainfully employed.[34]

Moreover, at no point has petitioner presented any evidence establishing the nature or scope of the investigation into petitioner's background conducted by petitioner's trial co-counsel–attorney Michael Sawyer–the attorney who called and questioned the defense witnesses presented during the punishment phase of petitioner's capital murder trial. This Court has previously noted that, when a criminal defendant is represented at trial by multiple attorneys, it is incumbent upon a defendant asserting ineffective assistance of counsel who wishes to overcome the presumption of reasonableness afforded trial counsel's decision-making to present evidence showing what

---

[34] First State Habeas Transcript, Volume 1 of 2 Court Reporter's Record, testimony of David Bays, at pp. 11-99.

information both of his trial counsel, i.e. the entire defense team, had available to them prior or at

the time of trial:

> Absent some showing a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland.  See Gutierrez v. Dretke,* 392 F.Supp.2d 802, 875–76 (W.D.Tex.2005), *Certificate of Appealability denied,* 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied,* 549 U.S. 1227, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007) (recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were *objectively* unreasonable).

*Bartee v. Quarterman*, 574 F. Supp. 2d 624, 649 (W.D. Tex. 2008), *CoA denied*, 339 F. App'x 429

(5th Cir. July 31, 2009), *cert. denied*, 559 U.S. 1009 (2010).

Other than attorney Bays' testimony during petitioner's initial state habeas corpus

proceeding, petitioner furnishes this Court with no factual allegations or any evidence showing what

information was available to his trial co-counsel attorney Sawyer or discovered by the court-

appointed defense investigator relating to petitioner's background.  Petitioner presents new evidence

which offers a more complete view of petitioner's school records, but these new school records

furnished by petitioner in support of his second amended petition only bolster the reasonableness of

the decisions reached by attorney Bays prior to petitioner's trial.  Attorney Bays testified at length

regarding the information about petitioner's background available to him prior to and at the time of

trial.  The bulk of the new affidavits and school records furnished by petitioner as attachments or

exhibits to his second amended petition fully support attorney Bays' beliefs that presentation of

mitigating evidence focusing on petitioner's limited intellectual capabilities would have opened the

door to a wide range of potentially devastating documentary evidence and expert testimony regarding

petitioner's lengthy history of alcohol, narcotics, and substance abuse and petitioner's history of disruptive, anti-social behavior while in school.  Attorney Bays' conclusion that evidence showing petitioner was borderline mentally retarded (or possessed simply below average intellectual capability) or had a history of long term drug and substance abuse could have proven as hurtful as helpful at the punishment phase of petitioner's trial was objectively reasonable.  *See Chanthakoummane v. Stephens*, 816 F.3d 62, 70 (5th Cir. 2016) (holding trial counsel was not ineffective for failing to present double-edged evidence at punishment phase of capital murder trial), *cert. filed,* May 31, 2016 (no. 15-9536); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (holding trial counsel did not render ineffective assistance by failing to present evidence at punishment phase of capital murder trial showing the defendant was functioning at a below average intelligence level and had abused alcohol and drugs), *cert. denied*, 540 U.S. 963 (2003).  "This Court has held that a tactical decision not to pursue and present potential mitigating evidence on the ground that is double-edged in nature of objectively reasonable."  *Hopkins v. Cockrell*, 325 F.3d at 586.

The Supreme Court has recognized that evidence of mental retardation is necessarily double-edged in nature in that while it might be viewed as diminishing the defendant's moral blameworthiness, it also tends to show the defendant cannot learn from his mistakes and, therefore, might pose a substantial risk of future dangerousness.  *See Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation and history of abuse is thus a two-edged sword:  it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.").  The Fifth Circuit has long recognized the double-edged nature of evidence showing a criminal defendant was voluntarily intoxicated at the time of an offense or had a history of voluntary substance abuse—and the heavy deference which must be given to a trial

31

counsel's decision not to introduce such evidence.  *See, e.g., Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir. 1996) (holding trial counsel did not render ineffective assistance by choosing not to introduce evidence of a defendant's drug and alcohol abuse which "had a double-edged quality"), *cert. denied*, 519 U.S. 1120 (1997); *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994) (holding counsel's decision not to introduce "double-edged" evidence of defendant's low intelligence or abusive childhood was entitled to a heavy measure of deference and did not constitute deficient performance), *cert. denied*, 514 U.S. 1117 (1995).

Petitioner has not identified specific facts or any evidence reasonably available at the time of his capital murder trial which shows it was objectively unreasonable for his defense team to rely upon school records showing petitioner scored a 91 on an IQ test in 1991 and the information made available to the defense team prior to trial from petitioner, his family, and his friends regarding petitioner's background 's formation when the defense team decided not to request a mental health evaluation of petitioner or the appointment of a mental health expert to evaluate petitioner. Petitioner's defense team did have the assistance of a court-appointed investigator and did review petitioner's school records contained in the prosecution's case file and did interview the petitioner, his mother and sister, a former employer, and several of petitioner's acquaintances.  At the time of petitioner's April, 2002 capital murder trial, the Supreme Court has not yet held that a finding of mental retardation exempts a convicted capital murderer from a sentence of death, and it was generally recognized that evidence of low intellectual capability was double-edged in nature.  The Supreme Court did not hand down its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), until June 20, 2002.  Under such circumstances, petitioner's trial counsel cannot reasonably be faulted for failing to retain the services of a mitigation specialist and independent mental health expert to

32

investigate whether petitioner suffered from mental retardation or low intellectual capability. *See United States v. Fields*, 565 F.3d 290, 296 (5th Cir.) ( "Clairvoyance is not a required attribute of effective representation."), *cert. denied*, 553 U.S. 914 (2009).

> "Judicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ibid.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

*Bell v. Cone*, 535 U.S. at 698 (quoting *Washington v. Strickland*).

Petitioner's jury was faced with only two special issues at the punishment phase of his April, 2002 capital murder trial. The first asked whether the evidence showed beyond a reasonable doubt that there was a probability the petitioner would commit criminal acts of violence which posed a continuing threat to society (the so-called "future dangerousness" special issue). The second special issue asked whether, considering all of the evidence, including the circumstances of petitioner's offense and the petitioner's character, background, and personal moral culpability, there was a sufficient mitigating circumstance, or sufficient mitigating circumstances, which warranted the imposition of a life sentence. Thus, unlike capital sentencing juries in many other jurisdictions, petitioner's jury was not asked to weigh specific aggravating factors against mitigating evidence.[35]

---

[35] Contrary to the argument contained in petitioner's second amended petition, Texas is not a "weighing jurisdiction" where capital sentencing jurors must balance "aggravating" versus "mitigating" factors before rendering a verdict at the punishment phase of a capital trial. *See Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999) ("Texas is a 'non-weighing state' in that its capital-sentencing scheme does not direct the appellate court or even the jury to 'weigh' aggravating factors against mitigating ones."), *cert. denied*, 528 U.S. 1145 (2000); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.) ("Texas, unlike Mississippi's sentencing procedure analyzed in *Stringer,* is not a 'weighing' jurisdiction; *i.e.,* the sentencer is not called upon to weigh mitigating evidence against a list of aggravating circumstances which the state must plead and prove."), *cert. denied*, 509 U.S. 947 (1993); *see also Williams v. Cain*, 125 F.3d 269, 281

At the time of petitioner's April, 2002 capital murder trial, the rule in *Atkins* was not the law of the land.  As explained above, evidence which shows a capital murder defendant suffered from mental retardation is highly double-edged in nature in that, while it might be viewed as diminishing the defendant's moral blameworthiness, it also tends to show the defendant cannot learn from his mistakes and, therefore, might pose a substantial risk of future dangerousness.  *Penry v. Lynaugh*, 492 U.S. at 324.  Petitioner has alleged no specific facts or furnished any evidence showing it was objectively unreasonable for his defense team to forego investigation into whether petitioner was mentally retarded in anticipation of petitioner's April, 2002 capital murder trial.

Insofar as petitioner argues his trial counsel should have requested the appointment of a mitigation specialist as a matter of course, that argument is *non sequitur*.  The first prong of *Strickland* analysis focuses on the objective reasonableness of the strategic and tactical decisions made by trial counsel, not on the subjective correctness of trial counsel's assumptions about the availability or propriety of additional investigative resources.  *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) ("Under *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' "); *Loden v. McCarty*, 778 F.3d 484, 494 (5th Cir.) ("To show deficient performance, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Reed v. Stephens,* 739 F.3d 753, 773 (5th Cir.2014) (quoting *Strickland* 466 U.S. at 688)), *cert. denied*, 136 S. Ct. 402 (2015).  Counsel's performance is judged based on prevailing norms of practice, and judicial scrutiny of counsel's performance must

---

(5th Cir. 1997) (discussing the differences between "weighing" and "non-weighing" capital sentencing schemes), *cert. denied*, 525 U.S. 979 (1998).

be highly deferential to avoid "the distorting effects of hindsight."  *Loden v. McCarty*, 778 F.3d at 494; *Carty v. Thaler,* 583 F.3d 244, 258 (5th Cir. 2009), *cert. denied*, 559 U.S. 1106 (2010).

Petitioner's defense team included an investigator, and they conducted an investigation into petitioner's background which included:  (1) review of petitioner's school records including an IQ test score from 1991 indicating petitioner had scored a 91 on a full scale test, (2) multiple interviews with petitioner and his mother and sister Claudia, and (3) interviews with petitioner's common law wife, former employer, and many of petitioner's acquaintances, including Ramon Martinez and Manuel Torres.  Petitioner has alleged no specific facts or provided any evidence, showing it was objectively unreasonable for his defense team to rely upon the information available through those sources to conclude that further inquiry into petitioner's mental health and intellectual capabilities would likely prove of little value in terms of producing mitigating evidence.  Contrary to the opinions expressed during petitioner's initial state habeas corpus proceeding by petitioner's expert witness,[36] *Strickland* does not establish a *per se* rule requiring the retention of a mitigation specialist

---

[36] Undermining the credibility of the opinion testimony presented by petitioner's attorney expert during petitioner's initial state habeas corpus proceeding is the absence of any information presented during petitioner's initial state habeas corpus proceeding establishing that petitioner's attorney expert:  (1) has ever tried a capital murder case to a verdict in Texas, (2) has ever tried a criminal case to a jury verdict in Bexar County, Texas, (3) has any familiarity as a practicing attorney with the Texas capital sentencing scheme which differs considerably from the capital sentencing schemes employed in various jurisdictions, (4) ever reviewed the testimony or other evidence presented during the guilt-innocence or punishment phases of petitioner's capital murder trial, (5) ever interviewed any of petitioner's trial counsel or the defense investigator appointed to assist petitioner's defense team, or (6) was aware petitioner's defense team relied upon their review of petitioner's school records and numerous interviews of petitioner. his family, and acquaintances in making their decisions not to seek the assistance of an independent mental health expert or a mitigation specialist.  Furthermore, the reliance by petitioner's attorney expert on the 2003 revisions to the American Bar Association's Guidelines is misplaced for a number of reasons.  First, the Supreme Court has made clear that such Guidelines may inform *Strickland* analysis but do not govern it.  *See Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009) (holding the ABA Guidelines and the like are only guides to what reasonableness means, not its definition).  Second, the 2003 version of those Guidelines were a dramatic change from, and greatly expanded the scope of an attorney's duties contained in, similar Guidelines which had been issued in 1989.  *Bobby v. Van Hook*, 558 U.S. at 8.  Third, petitioner's trial counsel did not have access in 2002 to the 2003 revisions.  Likewise, petitioner's trial counsel did not have access in April, 2002  to the Supreme Court's analysis of *Strickland* furnished in its June, 2003 decision in *Wiggins v. Smith*, 539 U.S. 510 (2003).  Thus, insofar as petitioner's attorney expert argued during his testimony in petitioner's initial state habeas corpus proceeding that the Supreme Court's opinion in *Wiggins* establishes a *per se* rule mandating appointment

and an independent mental health expert in every capital murder case.  "The defense of a criminal

case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate

the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th

Cir. 1992), *cert. denied*, 510 U.S. 829 (1993).

The Supreme Court has emphasized that "'counsel has wide latitude in deciding how best

to represent a client....'"  *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir.), *cert. denied*, 136 S. Ct. 86

(2015); *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir.) (citing *Yarbrough v. Gentry*, 540 U.S. 1, 5-6

(2003)), *cert. denied*, 133 S. Ct. 179 (2012).  This wide latitude includes the discretion to determine

how best to utilize the limited investigative resources available to defense counsel.  *See Ward v.*

*Stephens*, 777 F.3d at 264:

> That trial counsel decided to use its time and resources on mental-health experts,
> rather than on a professional mitigation specialist or further investigation into Ward's
> past, may very well reflect counsel's reasonable strategic decision "to balance limited
> resources" and to focus on expensive clinical psychologists and forensic experts
> rather than on investigators.  *See Richter,* 131 S.Ct. at 789 ("Counsel was entitled to
> formulate a strategy that was reasonable at the time and to balance limited resources
> in accord with effective trial tactics and strategies.").

This Court independently concludes petitioner has failed to allege any specific facts or

provide any evidence showing the decisions by his defense team not to (1) pursue an independent

mental health evaluation of petitioner regarding possible mental retardation, (2) request the

appointment of a mental health expert to evaluate petitioner, (3) request a mitigation specialist be

appointed to assist the defense team, or (4) investigate petitioner's background more thoroughly were

objectively unreasonable under the circumstances which existed at the time of petitioner's April,

---

of a mitigation specialist in every capital murder case, that argument has no application or relevance to this Court's
evaluation of the conduct of petitioner's trial counsel in April, 2002.

2002 capital murder trial.  Furthermore, this Court independently concludes after review of all of petitioner's new evidence there is no reasonable probability that, but for the failure of petitioner's trial counsel to present any of the new evidence presented during petitioner's initial state habeas corpus proceeding or attached to petitioner's second amended federal habeas corpus petition, the jury's answers to either of the two capital sentencing special issues during the punishment phase of petitioner's trial would have been any different.

Petitioner committed a heinous crime.  He kidnaped and murdered an innocent young man to obtain automobile parts which petitioner sold for a profit.  The family of petitioner's victim and many others throughout the community undertook a wide ranging search for the victim and his vehicle.  Days after petitioner set the remaining portion of his victim's vehicle on fire, petitioner returned to the location where he had fired multiple shotgun blasts into his victim at fairly close range and set the victim's decaying corpse on fire.  Petitioner managed to frighten one neighbor and a potential witness to his crime so badly, the young man fled the State of Texas.[37]  Another neighbor of the petitioner testified she became so fearful of petitioner after she saw missing person fliers around their neighborhood that she did not tell anyone what she knew about seeing a red Mustang in petitioner's possession.[38]  An acquaintance of the petitioner who baby-sat petitioner's children the night petitioner and his wife set the body on fire also became convinced the petitioner meant to do

---

[37] Prosecution witness Rudy Rodriguez, Jr. testified in pertinent part that: (1) shortly after he saw petitioner selling the parts off a red Mustang, he saw missing person fliers posted around their neighborhood showing Rick Marin and his red Mustang, (2) he told his mother that he believed petitioner was responsible for Rick Marin's disappearance, (3) his mother told petitioner's mother-in-law, (4) he became convinced the petitioner wanted to kill him, and (5) he moved out of his house across the street from petitioner and eventually moved to Oklahoma.  S.F. Trial, Volume 23, testimony of Rudy Rodriguez. Jr., at pp. 160-64.

[38] S.F. Trial, Volume 23, testimony of Nancy Rodriguez, at pp. 121-24.

him harm and stopped answering petitioner's telephone calls.[39]  There is no reasonable probability that, but for the failure of petitioner's trial counsel to present any of the new evidence furnished by petitioner during his first or second state habeas corpus proceedings, the jury's answer to the future dangerousness special issue would have been any different.

Likewise, there is no reasonable probability that, but for the failure of petitioner's trial counsel to present Dr. Rosin's testimony from petitioner's first state habeas corpus proceeding or any of the affidavits and documentary evidence accompanying petitioner's second state habeas corpus application, the jury's answer to the mitigation special issue would have been any different. Evidence of petitioner's low scores on IQ tests administered after petitioner turned eighteen would necessarily have led to the admission of testimony like that offered by Dr. Sparks during petitioner's initial state habeas corpus proceeding, as well as documents such as those accompanying petitioner's second amended federal habeas corpus petition.  The documents accompanying petitioner's latest federal habeas corpus petition establish petitioner (1) had a long history of alcohol and substance abuse - which teenage alcohol abuse was identified as a cause of the reduction in petitioner's IQ from 91 to 84 between 1991 and 1994 and (2) had a long history of disruptive, violent behavior in school. Petitioner's trial counsel testified during petitioner's initial state habeas corpus proceeding that the defense team's strategy during the punishment phase of petitioner's trial was to attempt to present mitigating evidence in the form of testimony through petitioner's family which showed the petitioner was non-violent as a child, was gainfully employed, and had a loving wife and children.  Given the lack of evidence of violent offenses committed by petitioner prior to his murder of Rick Marin, it

---

[39] Prosecution witness Anthony Rodriguez testified in pertinent part that, after he heard news reports about the discovery of a burned body, he became afraid to go out with petitioner because he feared the petitioner would harm him. S.F. Trial, Volume 28, testimony of Anthony Rodriguez, at pp. 69-73.

was objectively reasonable for petitioner's trial counsel to attempt to garner a favorable answer to the future dangerousness special issue through such testimony.  It was likewise objectively reasonable for petitioner's trial counsel to avoid presenting evidence which could have opened the door to expert mental health testimony suggesting petitioner has an anti-social personality and a long history of alcohol and substance abuse.  Moreover, there is no reasonable probability that, but for the failure of petitioner's trial counsel to offer any of petitioner's new evidence during the punishment phase of trial, the jury's answer to the mitigation special issue would have been any different.  Defense efforts to diminish petitioner's moral culpability through evidence showing petitioner: (1) had scored low on IQ tests following his arrest, (2)  had been the victim of others while growing up, (3) was not considered very smart by his fellow students and co-workers, and (4) had difficulty focusing on academic work would likely have been met with evidence from the exact same sources showing petitioner displays many of the symptoms of anti-social personality disorder and has a long history of alcohol and substance abuse.[40]  Having  re-weighed all the aggravating evidence against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course), this Court independently concludes there is no reasonable probability the outcome of the punishment phase of petitioner's trial would have been any different had petitioner's trial counsel presented any or all of the new evidence offered during petitioner's initial and second state habeas corpus proceedings.  This Court's conclusion is the same when all the new evidence accompanying petitioner's second amended petition is considered.  There is no evidence currently

---

[40] Attorney Bays testified without contradiction during petitioner's initial state habeas corpus proceeding that petitioner's mother told him:  (1) petitioner had a rough childhood after his father died, (2) petitioner joined a gang and sold dope, (3) petitioner abused marijuana, (4) petitioner abused alcohol, and  (5) while petitioner was slow, he was not mentally retarded.  Volume 1 of 2 of Court Reporter's Record, First State Habeas Transcript, testimony of David Bays, at pp. 61-64.

before this Court showing petitioner has ever expressed any sincere contrition or genuine remorse for his offense.  Nor did petitioner ever indicate a willingness to accept responsibility for his offense in front of his jury.[41]

Insofar as petitioner complains his trial counsel met with him for less than ten hours prior to the start of trial, petitioner fails to allege any specific facts or provide any evidence showing it was objectively unreasonable for his trial counsel to meet with petitioner for only about nine point six hours prior to the start of jury selection or there was any relevant information which petitioner was unable to furnish his trial counsel due to the alleged brevity of their pretrial conferences.  The brevity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance.  *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984); *Jones v. Wainwright*, 604 F.2d 414, 416 (5th Cir. 1979).  This complaint fails to satisfy either prong of *Strickland* analysis.

Petitioner complains his trial counsel failed to make an opening statement at the punishment phase of trial but fails to allege any facts showing this decision was objectively unreasonable or that the outcome of the punishment phase of his capital murder trial would have been any different had his trial counsel made an opening statement at the punishment phase of trial.  *See United States v. Stedman*, 69 F.3d 737, 740 (5th Cir. 1995) (holding ineffective assistance claim based on failure to make opening statement failed because movant did not allege how or why trial would have ended differently but for the absent opening statement), *cert. denied*, 519 U.S. 912 (1996); *Gilliard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988) (holding decision whether to make an opening statement is the essence of a strategic choice), *cert. denied*, 488 U.S. 1019 (1989).  Petitioner fails

---

[41] Attorney Bays testified without contradiction during petitioner's first state habeas corpus proceeding that petitioner never offered to accept responsibility for Rick Marin's murder at the punishment phase of trial.  Volume 1 of 2 of Court Reporter's Record, First State Habeas Transcript, testimony of David Bays, at p. 69.

to identify any relevant information his trial counsel failed to include in said counsel's closing jury argument at the punishment phase of petitioner's trial.  Moreover, petitioner fails to offer any explanation as to how or why the waiver of opening statement was either objectively unreasonable or outcome determinative at the punishment phase of his capital murder trial.  This conclusory assertion of ineffective assistance also fails to satisfy either prong of *Strickland* analysis.

To the extent petitioner complains his trial counsel failed to obtain additional school records on petitioner prior to trial, petitioner also fails to allege any facts showing it was objectively unreasonable for his trial counsel to rely upon the school records available to said counsel to determine whether to pursue additional records or there is a reasonable probability that, but for the failure of petitioner's trial counsel to obtain all of the school records accompanying petitioner's second amended federal habeas petition, the outcome of the punishment phase of petitioner's trial would have been any different.  As explained above, the additional school records furnished to this Court by petitioner's federal habeas counsel fully support the decisions by petitioner's trial counsel not to further investigate petitioner's mental health.  The school records attached to petitioner's second amended federal habeas corpus petition also support the concern expressed by petitioner's trial co-counsel that introduction of mental health evidence at the punishment phase of petitioner's trial would likely have opened the door to a wide variety of very compelling negative evidence showing petitioner's propensity for violent conduct during childhood, long history of alcohol and substance abuse, and anti-social personality disorder.  Both Dr. Rosin and Dr. Sparks appeared to agree during their testimony at petitioner's initial state habeas corpus proceeding that petitioner

41

displayed many of the attributes of a person with anti-social personality disorder.[42] It was objectively reasonable for petitioner's trial counsel to wish to avoid having the jury hear expert testimony regarding petitioner's anti-social personality disorder.[43]   Such testimony would have greatly undermined the defense team's punishment phase strategy which sought to portray petitioner's murder of Rick Marin as inconsistent with petitioner's non-violent personality and pattern of behavior.

E.    Procedural Default on Summarily Dismissed Ineffective Assistance Claims

Respondent correctly points out that petitioner procedurally defaulted on all of his claims for ineffective assistance that were not included in petitioner's initial state habeas corpus proceeding.

---

[42] First State Habeas Transcript, at pp. 191-94, Volume 2 of 2 Court Reporter's Record, testimony of Dr. Susana Rosin, at pp.36-39; First State Habeas Transcript, at pp. 302-03, Volume 2 of 2 Court Reporter's Record, testimony of Dr. John C. Sparks, at pp. 147-48.

[43] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, American Psychiatric Association (2013), describes antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." *DSM-5*, at p. 659. Deceit and manipulation are central features of antisocial personality disorder. *Id.*   The DSM-5 defines antisocial personality disorder through the following diagnostic criteria:

A.  A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:
1. Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.
2. Deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure.
3. Impulsivity or failure to plan ahead.
4. Irritability and aggressiveness, as indicated by repeated physical fights or assaults.
5. Reckless disregard for safety to self or others.
6. Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.
7. Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another
B.  The individual is at least age 18 years.
C.  There is evidence of conduct disorder with onset before age 15 years.
D.  The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.

*DSM-5*, at p. 659.

More specifically, petitioner has procedurally defaulted on his ineffective assistance complaints addressing (1) the decision by petitioner's trial counsel to waive an opening statement at the punishment phase of trial and (2) the decision by petitioner's trial counsel not to seek additional records from petitioner's schools. Petitioner included those specific complaints only in his second state habeas corpus application which the Texas Court of Criminal Appeals summarily dismissed as an abuse of the writ. Thus, petitioner has procedurally defaulted those two assertions of ineffective assistance. *See, e.g., Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004) (holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003) (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163 (2004).

Petitioner is not entitled to merits review of his procedurally defaulted ineffective assistance claims under the Supreme Court's holdings in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), because, for the reason discussed above, petitioner's underlying procedurally defaulted ineffective assistance complaints about the performance of his trial counsel are insubstantial, i.e., they lack some merit. *See Norman v. Stephens*, 817 F.3d 226, 232 (5th Cir. 2016 (holding a petitioner attempting to rely upon *Martinez* to circumvent a procedural default must

show both (1) appointed counsel in the initial review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* and (2) the underlying claim of ineffective assistance by trial counsel is substantial, which is to say the prisoner must demonstrate the claim has some merit); *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014) ("To succeed in establishing cause under *Trevino* and *Martinez,* the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.), *cert. denied*, 135 S. Ct. 2312 (2015).  As explained above, petitioner's complaints that his trial counsel met with him for less than ten hours prior to trial and waived making an opening statement at the punishment phase of trial fail to satisfy the dual prongs of *Strickland* analysis.

Furthermore, petitioner's complaints about the performance of his initial state habeas counsel fail to satisfy the dual prongs of *Strickland* analysis.  Petitioner's initial state habeas counsel raised an *Atkins* claim and a variety of ineffective assistance claims, some of which petitioner continues to litigate in this federal habeas corpus proceeding.  Petitioner's initial state habeas counsel presented the state trial court with evidence supporting those ineffective assistance claims consisting of testimony from one of petitioner's trial counsel, an attorney expert on mitigation evidence development, and a qualified mental health expert who opined petitioner was mentally retarded. After carefully reviewing all of the voluminous documents accompanying petitioner's second federal habeas corpus petition, this Court concludes those documents contain no information helpful to petitioner which was unavailable to Dr. Rosin when she testified before the state habeas trial court. In fact. some of the new evidence petitioner presents to this Court, particularly petitioner's special education records from the Somerset ISD, tend to undermine Dr. Rosin's conclusions and support

44

Dr. Sparks' assertion that petitioner is not mentally retarded.   Petitioner has failed to demonstrate there was anything objectively unreasonable with the performance of his initial state habeas counsel vis-a-vis petitioner's original ineffective assistance claims.   Petitioner has also failed to establish there was any additional evidence available at the time of petitioner's first state habeas corpus proceeding which, in all reasonable likelihood, would have altered the outcome of petitioner's initial state habeas corpus proceeding.   There is no reasonable probability the anecdotal testimony of petitioner's mother, former teachers, and acquaintances about petitioner's lack of sophistication and poor academic skills would have resulted in a different outcome in petitioner's initial state habeas corpus proceeding because such evidence would have been countered with evidence in petitioner's special education records showing petitioner twice tested as a teenager far above the standard error of measurement for mental retardation and petitioner had a history of abusive, disruptive behavior and alcohol and substance abuse.   In fact, the new school records furnished by petitioner's federal habeas counsel fully support attorney David Bays' characterization of petitioner as a person who was abusive toward others, rebellious, and got into a lot of trouble in school and whose placement in an alternative school setting was based upon his disruptive behavior rather than his inability to perform academically. Those same records also document petitioner's "excessive" abuse of alcohol at a tender age.   There is no reasonable probability that, but for the failure of petitioner's initial state habeas counsel to present the state habeas court with any of the new or additional evidence furnished to this Court by petitioner's federal habeas counsel, the outcome of petitioner's initial state habeas corpus proceeding would have been any different.

F.    Conclusions

The Texas Court of Criminal Appeals rejection on the merits during the course of petitioner's initial state habeas corpus proceeding of petitioner's ineffective assistance complaints about the failure of petitioner's trial counsel to (1) request court-appointment of a mitigation specialist, (2) request court-appointment or to retain the services of an independent mental health expert to evaluate petitioner, (3) investigate mitigating evidence showing petitioner suffered from mental retardation, and (4) present evidence showing petitioner suffers from mental retardation was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's initial state court proceeding.   This Court independently concludes after *de novo* review that all of petitioner's claims of ineffective assistance contained in his second amended federal habeas corpus petition fail to satisfy either prong of *Strickland* analysis, even when all of the documents attached to petitioner's second amended federal habeas corpus petition are considered.   Petitioner's procedurally defaulted ineffective assistance claims lack substance.   None of petitioner's ineffective assistance claims warrant federal habeas corpus relief.

## VI. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA").   *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997) (holding the standard for obtaining a CoA is the same as for a CPC).   The CoA requirement supersedes the

previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.  *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.  *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c)(2).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone.  *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).  A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate

to deserve encouragement to proceed further.  *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. at 484; *Barefoot v. Estelle*, 463 U.S. at 893 n.4.  This Court is required to issue or deny a CoA when it enters a final order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the district court disposed of the claim.  "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484); *Tennard v. Dretke*, 542 U.S. at 282.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

Reasonable minds could not disagree over this Court's conclusions that:  (1) all of petitioner's assertions of ineffective assistance fail to satisfy the prejudice prong of *Strickland*

analysis, (2) all of petitioner's assertions of ineffective assistance fail to satisfy the deficient performance prong of *Strickland* analysis, (3) petitioner procedurally defaulted on those of his ineffective assistance claims which he included for the first time in his second state habeas corpus application, (4) petitioner's first claim for relief herein, i.e. his *Atkins* claim, has been withdrawn from this Court's consideration, and (5) petitioner's third claim for relief, i.e., his complaints about the performance of his initial state habeas counsel, do not satisfy either prong of *Strickland* analysis and do not furnish an independent basis for federal habeas corpus relief. Petitioner is not entitled to a Certificate of Appealability on any of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. Petitioner's second amended federal habeas corpus petition, filed April 25, 2014 (ECF no. 70), is in all respects **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability on all claims in his second amended federal habeas corpus petition.

3. All pending motions are **DISMISSED AS MOOT**, and this case is now **CLOSED.**

It is so ORDERED.

SIGNED this 29th day of July, 2016.

_____

FRED BIERY
UNITED STATES DISTRICT JUDGE